IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 13-113 |
| | ) | |
| PETER WOODLEY | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

DIAMOND, D.J.

On March 8 and 9, 2016, a non-jury trial was held before this member of the court as to Count One of a Superseding Indictment at Criminal No. 13-113 charging defendant Peter Woodley with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin from in and around December 2011, until in and around August 2012, in violation of 21 U.S.C. §846. For reasons set forth herein, the court finds defendant not guilty as to Count One of the Superseding Indictment.

### I.  Procedural History

A grand jury returned a three-count Superseding Indictment against defendant on July 15, 2014, charging him with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin from in and around December 2011, until in and around August 2012, in violation of 21 U.S.C. §846 (Count One), possession of a firearm by a convicted felon on or about September 17, 2012, in violation of 18 U.S.C. §§922(g)(1) and 924(e) (Count Two), and possession

with intent to distribute heroin on or about March 20, 2013, in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(C) (Count Three).

Ultimately a jury trial was scheduled for March 7, 2016. Prior to jury selection, however, defendant informed the court that he wished to change his plea to guilty to Counts Two and Three of the Superseding Indictment and proceed with a non-jury trial as to Count One. The court accepted defendant's plea and found him guilty as to Counts Two and Three of the Superseding Indictment. The court also accepted defendant's waiver of his right to a jury trial on Count One, to which the government had consented, and proceeded with the non-jury trial on March 8 and 9, 2016.

The court's findings of fact and conclusions of law are set forth herein. Based upon those findings and conclusions, the court denies defendant's renewed oral motion for judgment of acquittal, which he made at the close of all evidence,[1] but finds him not guilty as to Count One of the Superseding Indictment in this case.

---

[1] Federal Rule of Criminal Procedure 29(a) provides that a court may enter a judgment of acquittal of any offense for which the evidence is "insufficient to sustain a conviction." In applying this standard, the court must view the evidence in the light most favorable to the government to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). "This standard remains the same despite the fact that this was a non-jury trial." United States v. Stubler, 2006 WL 3043073, at *2 (M.D. Pa. Oct. 24, 2006), aff'd, 271 Fed. Appx. 169 (3d Cir. 2008) (citation omitted).

Viewing the evidence in the light most favorable to the government, it is possible that a rational trier of fact could have found the essential elements of a drug conspiracy charge beyond a reasonable doubt. For that reason, the renewed motion for judgment of acquittal is denied. However, as explained in section IV below, careful consideration of the evidence presented leads the court to conclude that the government did not meet its burden to prove beyond a reasonable doubt that the conspiracy charged in Count One of the Superseding Indictment involved one kilogram or more of heroin.

AO 72
(Rev. 8/82)

## II. Evidence Presented at Non-Jury Trial

The government presented testimony at the non-jury trial by the following witnesses: (1) former Penn Hills Police Officer Michael Hudek; (2) New Castle Police Officer Christopher Bouye, a task force officer assigned to work with the Drug Enforcement Administration ("DEA"); (3) Jody Bland; (4) Veryl Long; and (5) Pennsylvania State Trooper Eric Maurer. Defendant called DEA Agent Melissa Laukaitis to testify. The relevant testimony and documentary evidence received at the non-jury trial consisted essentially of the following:

Officer Hudek testified that he was involved in the investigation of the heroin distribution organization of one Veryl Long. This organization included numerous individuals who sold drugs in the eastern suburbs of Allegheny County and parts of Westmoreland County, Pennsylvania. Transcript ("Tr.") of Non-Jury Trial (Document No. 177) at 27.[2] These individuals included Veryl Long, Dextrick Lawton, Brandon Page, Albert Wilhoite and others. (Tr. at 60, 65, 89-90, 120).

Officer Hudek participated in the execution of a search warrant at Long's residence on December 1, 2011, but no drugs were found at that time. (Tr. at 27-28). Long testified that after execution of that search warrant, drug suppliers in the Pittsburgh area did not want to deal with him because he had not been arrested and they feared that he might be cooperating with the authorities. (Tr. at 121). Consequently, Long developed an alternate source of supply, a man who he knew only as "Black," who turned out to be a cousin of defendant. (Tr. at 121). Initially, Long obtained samples of heroin from Black and then began dealing with him in December, 2011. (Tr. at 122-23). Through his dealings with Black, Long eventually met defendant and concluded that

---

[2]The complete Transcript of the non-jury trial proceedings is filed at Document Nos. 176, 177 and 178. Unless otherwise noted, all page citations to the Transcript refer to Document No. 177.

3

defendant was really the "big guy" because he expressed an interest in making the samples "right" when Long complained of problems with them. (Tr. at 123-25). After defendant assured Long that "he could make it right," the two exchanged phone numbers and began doing sample runs, which ultimately progressed to Long purchasing heroin on a somewhat regular basis directly from defendant. (Tr. at 125).

Both Long and Jody Bland, also a cousin of Long,[3] testified that prior to execution of the search warrant at Long's residence in December, 2011, Long purchased heroin from suppliers other than defendant. (Tr. at 64, 102, 182-83, 187). However, Long testified that he actually began purchasing heroin from defendant in mid-January, 2012, which is consistent with Ms. Bland's recollection that defendant became associated with Long's organization after execution of the search warrant at Long's residence the prior month. (Tr. 68-69, 126).

Defendant supplied Long with heroin by transporting it from New Jersey to Pittsburgh via Greyhound bus. (Tr. 69, 126). Until Long and defendant "found the right application" of heroin, Long would buy whatever amount of heroin defendant had available, which could have been five to ten bricks,[4] but Long was not exactly sure how long that arrangement lasted. (Tr. at 192). However, once they "got into the swing of things," Long at one point testified that he never purchased less than 100 bricks of heroin from defendant. (Tr. at 201).

Initially, Long paid defendant cash for heroin, but as their relationship progressed, Long

---

[3]Ms. Bland testified that she resided with Long, spent significant amounts of time with him, shared a close relationship with him like that of sister and brother and that he told her everything. (Tr. at 64, 70, 82, 88-89).

[4]Long explained that one kilogram of heroin is equivalent to 1,000 grams of heroin, or 1,000 bricks of heroin, thus each brick of heroin weighs approximately one gram. (Tr. at 210, 212).

4

AO 72
(Rev. 8/82)

explained that defendant also fronted heroin to him. (Tr. at 125). Jody Bland testified to the fronting arrangement, and explained that on one occasion at Long's direction, she gave defendant money for heroin he had fronted Long. (Tr. at 81). The fronting of heroin involved Long paying in cash for about half of the heroin defendant provided on a particular trip with the remainder being given to Long on credit. (Tr. at 125).

A pattern of sorts developed in the relationship between defendant and Long. Defendant would travel to Pittsburgh with heroin, and Long would buy whatever quantity defendant brought with him, which was never guaranteed, but was always at least 100 bricks according to Long's testimony at one point. (Tr. at 128, 167). Long would pay defendant for about half of the heroin he provided, defendant would front additional heroin to Long, and defendant would stay in Pittsburgh until Long sold some of the heroin and paid off most of the debt, at which point he would travel back to New Jersey to obtain more heroin. (Tr. at 128-29). According to Long, defendant traveled back and forth between New Jersey and Pittsburgh "mostly . . . once a week. But on the safer side, guaranteed once every two weeks . . ." for a period of four to five months, but, as we note below, Long later testified that the period was three to four months. (Tr. at 129, 168, 212). Long testified that each time he purchased at least 100 bricks of heroin, and defendant fronted him an additional 100 to 150 bricks. (Tr. at 129, 211). Initially, Long paid defendant $150 dollars per brick of heroin, but as their relationship progressed, the price decreased to $115 to $125 per brick. (Tr. at 130).

Long testified that sometimes he and defendant also exchanged cash and heroin in a grill located on the patio at Long's residence. Long would leave cash in the grill for defendant, and when Long would return to his residence the cash would be gone and heroin would be left in its

5

place inside the grill. (Tr. at 130). Jody Bland also testified that the grill on Long's patio sometimes was used for exchanges of cash and heroin. (Tr. at 79-80). In addition, Bland testified that she observed Long and defendant conduct heroin transactions in the back yard of Long's residence on two or three occasions in May and June, 2012.[5] (Tr. at 86-88).

On two occasions, Long traveled to New Jersey to meet with defendant. Long testified that he decided to go on the first trip to New Jersey because "[i]t seemed like it took longer for [defendant] to get back from our normal [heroin delivery pattern]." (Tr. at 131). On the first occasion, Long was accompanied by Dextrick Lawton, Jody Bland and another female. (Tr. 70, 132). This trip occurred near the end of April, 2012, which is when Jody Bland testified she first met defendant. (Tr. at 76-78). Jody Bland was going to transport heroin back to Pittsburgh via the Greyhound bus, but ultimately that did not occur because Long was unable to obtain heroin from defendant, who claimed the heroin then available was "not right." (Tr. at 75, 132-33). Ms. Bland also testified that Long did not obtain any heroin from defendant in April, 2012. (Tr. at 101).

On the second occasion, Long traveled to New Jersey where he and defendant obtained raw heroin. (Tr. at 133-34). While in New Jersey on this occasion, Long and defendant "did test runs" by having people sample heroin until they found what they liked. (Tr. at 134). When that occurred, Long and defendant bought two ounces of raw heroin, transported it back to Pittsburgh together on the Greyhound bus, rented a hotel room, purchased items needed for the packaging and processed and packaged the raw heroin into stamp bags. (Tr. at 134-35). To accomplish that, Long and defendant went to a store in Pittsburgh to buy some of the items they needed, but defendant

---

[5]Ms. Bland conceded that she could not provide the exact dates of these drug transactions. (Tr. at 86, 88). Ms. Bland later explained that individuals involved in drug dealing do not keep calendars or records for the obvious reason that they wanted to avoid incriminating themselves. (Tr. at 113, 114-15).

6

already had purchased the stamp bags and the material used to dilute the heroin at a head shop in New Jersey. (Tr. at 136, 138). Long testified that was the first time he had processed and packaged raw heroin, so defendant had to instruct him on how to proceed. (Tr. at 137). The entire process took three days, which occurred in late May or early June, 2012, and resulted in the production of 160 bricks of heroin. (Tr. at 137, 138-39).

In addition to their heroin trafficking activities, on one occasion, defendant asked Long about purchasing a gun, but Long indicated he did not have a gun for defendant, although Brandon Page might have one. (Tr. at 139).

In July 2012, Long was arrested and subsequently incarcerated for about one month. (Tr. at 140). During that time, defendant did not supply any heroin to Long's organization and Dextrick Lawton informed Long that he needed to obtain heroin. (Tr. at 141). Through Long's girlfriend, Long contacted defendant, who fronted 20 bricks of heroin to Lawton. (Tr. at 141-42).

After Long was released from prison, he did not purchase any more heroin from defendant during the Superseding Indictment period. (Tr. at 142, 166). And Long was not in further contact with defendant until sometime after the Superseding Indictment period when defendant reached out to him via a Facebook post. (Tr. at 143). Subsequently, when Long began cooperating with the government, he was able to contact defendant and record conversations with him. (Tr. at 144).

Finally, DEA Agent Laukaitis testified that she had learned from her investigation that defendant was the supplier of drugs to Long's organization. Transcript of Non-Jury Trial (Document No. 178) at 41. Agent Laukaitis confirmed that she previously testified before the grand jury that Long had told her that he purchased 60 to 100 bricks of heroin from defendant per week in the time period after December, 2011, until August, 2012. Id. at 33.

7

AO 72
(Rev. 8/82)

### III. Legal Standard

As stated, defendant is charged in Count One of the superseding indictment with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §846. Section 846 makes it a crime to "attempt[] or conspire[] to commit any offense defined in this subchapter" and further states that a person who attempts or conspires to commit any offense "shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." The underlying offense of distribution and possession with intent to distribute heroin in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(A)(i) is the object of the charged conspiracy in Count One. Those provisions make it a crime to knowingly or intentionally distribute or possess with intent to distribute one kilogram or more of heroin.

The elements of a drug conspiracy under 21 U.S.C. §846 are: (1) that two or more persons agreed to distribute and/or possess with the intent to distribute a controlled substance; (2) that the defendant was a party to or member of that agreement; (3) that the defendant joined the agreement or conspiracy knowing of its objective to distribute and/or possess with the intent to distribute a controlled substance and intending to join together with at least one other alleged conspirator to achieve that objective; and (4) that the conspiracy involved the type and quantity of controlled substance alleged in the indictment, which in this case is one kilogram or more of heroin. See Third Circuit Model Criminal Jury Instructions, §§6.21.846B and 6.21.841C; United States v. Claxton, 685 F.3d 300, 305 (3d Cir. 2012).

As the Third Circuit Court of Appeals has explained, "[t]o prove a conspiracy, the government must establish a unity of purpose between the alleged conspirators, an intent to achieve

8

a common goal, and an agreement to work toward that goal." United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999); see also United States v. Kelly, 629 Fed. Appx. 258, 260 (3d Cir. 2015). The government may prove these elements by circumstantial evidence, and need not prove that each defendant knew all of the details, goals or other participants of the conspiracy. Gibbs, 190 F.3d at 197.

With respect to the amount of controlled substance, a finding must by made as to the drug type and quantity involved in the conspiracy as a whole, not the quantity attributable to each co-conspirator. United States v. Garvey, 588 Fed. Appx. 184, 188 (3d Cir. 2014) (citing United States v. Phillips, 349 F.3d 138, 142-43 (3d Cir. 2003), *vacated and remanded on other grounds sub nom.* Barbour v. United States, 543 U.S. 1102 (2005)). Simply put, the finding of drug quantity is "an offense-specific, not a defendant-specific, determination." Phillips, 349 F.3d at 143 (the trier of fact "must find, beyond a reasonable doubt, the existence of a conspiracy, the defendant's involvement in it, and the requisite drug type and quantity involved in the conspiracy as a whole.").

Of course, the government must prove beyond a reasonable every element of the charged drug conspiracy before defendant may be found guilty of the offense. A reasonable doubt is a doubt which fairly arises out of all the evidence or lack thereof and is based upon reason, logic, common sense or experience. It is a doubt of the sort that would cause one to hesitate to act in matters of importance in his or her life. It may arise from the evidence, or from the lack of evidence, or from the nature of the evidence. After considering all the evidence, if a reasonable doubt exists regarding the defendant's guilt as to the drug conspiracy charge against him, he is entitled to the benefit of that doubt and must be found not guilty of the charge. See Third Circuit Model Criminal Jury Instructions, §3.06.

9

AO 72
(Rev. 8/82)

Finally, in a drug conspiracy case such as this, where the major participants in question are the seller and the buyer of the controlled substance, consideration must be given as to whether more than a mere buyer-seller relationship existed. This is because "a simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish that the buyer was a member of the seller's conspiracy." Gibbs, 190 F.3d at 197. However, even an occasional supplier can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that he was part of a larger operation. See United States v. Theodoropoulos, 866 F.2d 587, 594 (3d Cir.1989), *overruled on other grounds by* United States v. Price, 76 F.3d 526 (3d Cir.1996). For example, in Theodoropoulos, 866 F.2d at 594, the Third Circuit concluded that evidence that a drug supplier was informed by the buyer of a third party's complaint about the quality of the drugs he supplied established that the supplier knew he was part of a larger drug operation and that evidence supported a conviction of conspiracy. In addition, the Third Circuit has held that a conspiracy existed, rather than a relationship between a buyer and a seller, where one individual helped another process cocaine into crack and package the drugs for sale. See United States v. Scott, 607 Fed. Appx. 191, 196 (3d Cir. 2015).

Other factors courts consider in determining whether more than a buyer-seller relationship exists include the length of affiliation between the defendant and the conspiracy, whether there is an established payment method, the extent to which transactions are standardized, whether there is a demonstrated level of mutual trust, whether the transactions involve large amounts of drugs and whether the drugs were purchased on credit.[6] See Gibbs, 190 F.3d at 199-200; United States

---

[6] Whether drugs were purchased on credit may be relevant because such an arrangement may reflect a greater level of trust between the parties and indicates their mutual stake in each other's transactions. Gibbs, 190 F.3d at 200.

10

v. Badini, 525 Fed. Appx. 190, 192 (3d Cir. 2013). Although these factors are not dispositive of the issue, "the presence of one or more of these factors furthers the inference that the [defendant] knew that he was part of a larger operation and hence can be held responsible as a co-conspirator." Gibbs, 190 F.3d at 200.

IV. **Findings of Fact and Conclusions of Law**

Except where the court makes specific findings to the contrary below, the court adopts as its factual findings in this case the summary of evidence presented at the non-jury trial as set forth in section II, supra, and the inferences drawn therefrom which follow. Based upon those factual findings and in consideration of the applicable legal principles discussed above, the court finds that the government met its burden to prove beyond a reasonable doubt that defendant was involved in a conspiracy with Veryl Long and his associates to distribute and possess with the intent to distribute heroin in the Pittsburgh area as alleged in Count One of the Superseding Indictment. However, the court further finds that the government failed to meet its burden to prove beyond a reasonable doubt that the conspiracy involved one kilogram or more of heroin during the time period alleged in that Count.

A. **The Government Proved Beyond a Reasonable Doubt That Defendant Was a Member of a Conspiracy the Purpose of Which Was to Distribute and Possess With the Intent to Distribute Heroin**

The court first finds that the government proved beyond a reasonable doubt the existence of a conspiracy to distribute and possess with intent to distribute heroin and defendant's membership in it at or about the time set forth in the Superseding Indictment.

11

Long met defendant after first becoming acquainted with defendant's cousin, Black. When Long cited concerns about some of the samples of heroin he received from Black, defendant assured Long that he could "make it right," after which time Long began purchasing heroin from defendant for distribution in the Pittsburgh area. After some initial sample runs, defendant transported heroin from New Jersey to Long in Pittsburgh via the Greyhound bus approximately every week or two for several months. Long initially paid cash for the heroin, but as the relationship between Long and defendant progressed, defendant also fronted heroin to Long. A pattern developed whereby Long paid defendant cash for about half of the heroin he provided, defendant then fronted additional heroin to Long, and defendant stayed in Pittsburgh until Long paid off most of the debt, at which time defendant would travel back to New Jersey to obtain more heroin. On some occasions, Long and defendant exchanged cash and heroin by leaving it in a grill at Long's residence.

On two occasions, Long traveled to New Jersey to meet with defendant to obtain heroin. Long was unable to obtain heroin on the first trip, but was successful on the second trip, when he and defendant purchased raw heroin. Long and defendant then traveled back to Pittsburgh and spent three days in a hotel processing and packaging the raw heroin into stamp bags for distribution. In addition, defendant once inquired of Long whether he could obtain a gun from him, and Long suggested that Brandon Page, another member of the heroin trafficking organization, might have one for defendant. Finally, at Long's request while he was incarcerated in July 2012, defendant fronted heroin to Dextrick Lawton, who also was a member of Long's organization.

The above-described relationship between Long and defendant demonstrates that the two men shared a unity of purpose, an intent to achieve a common goal and an agreement to work

12

toward that goal, which was to sell heroin for profit in the Pittsburgh area. See Gibbs, 190 F.3d at 197.

Contrary to defendant's argument, more than a mere buyer-seller relationship existed between Long and him. As discussed, Long and defendant developed an established payment method, which also included defendant providing heroin to Long on credit. Long would pay cash for about half of the heroin defendant provided and defendant fronted additional heroin to Long, which was essentially providing it on credit. The transactions between Long and defendant were somewhat standardized, and involved defendant traveling from New Jersey to Pittsburgh to provide Long with heroin for distribution. Defendant would stay in Pittsburgh until Long paid off most of any debt he owed for fronted heroin, at which time defendant would travel back to New Jersey for more heroin. In addition, there was a demonstrated level of mutual trust between the two men, as defendant was willing to front heroin to Long until he was able to pay off the resulting debt. See Gibbs, 190 F.3d at 199-200 (summarizing factors to consider in determining whether more than a mere buyer-seller relationship exists). Defendant also fronted heroin to Dextrick Lawton, who was another member of Long's heroin distribution organization. These factors alone indicate that defendant was part of a heroin distribution conspiracy with Long. See id. at 200.

There was further evidence that demonstrates that defendant knowingly conspired with Long to distribute and possess with intent to distribute heroin. Defendant assured Long he would "make it right" when he was informed about problems with the quality of the heroin Long received from Black. See Theodoropoulos, 866 F.2d at 594 (evidence that a drug supplier was informed by the buyer of a third party's complaint about the quality of the drugs he supplied established that the supplier knew he was part of a larger drug operation and that evidence supported a conviction of

13

conspiracy). In addition, defendant and Long processed and packaged raw heroin into stamp bags over a three-day period at a hotel in Pittsburgh, with defendant instructing Long on how to do the processing and packaging. See Scott, 607 Fed. Appx. at 196 (finding a conspiracy existed, rather than a relationship between a buyer and a seller, where one individual helped another process cocaine into crack and package the drugs for sale).

The court, therefore, finds beyond a reasonable doubt that a heroin distribution conspiracy was proved by the government in this case and that defendant was a member of that conspiracy.

**B.  The Government Did Not Meet its Final Burden to Prove Beyond a Reasonable Doubt That the Conspiracy Involved One Kilogram or More of Heroin During the Time Period Alleged in Count One of the Superseding Indictment**

In connection with the conspiracy charged in this case, the government need only prove the quantity of heroin involved in the conspiracy as a whole, and need not prove the quantity attributable to each co-conspirator. See Garvey, 588 Fed. Appx. at 188. Nevertheless, for reasons stated below, the court finds that the government failed to meet that burden and to prove beyond a reasonable doubt that the conspiracy in this case involved one kilogram or more of heroin during the relevant period alleged in Count One of the Superseding Indictment.

According to both Veryl Long and Jody Bland, Long purchased heroin from other suppliers prior to December, 2011. However, the evidence presented at the trial indicates that defendant was the only person who supplied heroin to Long during the time period alleged in Count One of the Superseding Indictment. As Long explained, after a search warrant was executed at his residence in December, 2011, drug suppliers in the Pittsburgh area did not want to deal with him, so he developed an alternate source of supply, a person who he knew as "Black." Through his acquaintance with Black, Long met defendant and began purchasing heroin from him. The

14

relationship between Long and defendant continued until Long was incarcerated in July, 2012. The government did not present any evidence to indicate that Long or his associates purchased from suppliers other than defendant in the time period after December, 2011, until August, 2012. Thus, the only heroin attributable to the conspiracy charged in Count One of the Superseding Indictment is the heroin which defendant supplied to Long.

After careful consideration of the evidence in this case regarding the amount of heroin defendant supplied to Long, and hence the amount of heroin involved in the conspiracy, a reasonable doubt exists in the mind of the court as to whether the conspiracy involved one kilogram or more of heroin during the approximate eight-month time period from December, 2011 until August, 2012, as charged in Count One of the Superseding Indictment.[7]

First, the following evidence creates doubt about the <u>period of time</u> defendant supplied Long with heroin:

- Agent Laukaitis testified that she had testified before a grand jury that Long told her that he purchased heroin from defendant in the eight month time period after December, 2011 until August, 2012. (Tr. at 33, Document No. 178).

- However, Long testified that he did not start dealing with defendant on a regular basis until mid-January, 2012. (Tr. at 126).

- Long further testified that he dealt with defendant until July, 2012, when Long went to jail for about one month, and did not have any further dealing with defendant during the time period alleged in Count One of the Superseding Indictment. (Tr. at 140, 142-43, 166).

- Based on the above, defendant supplied Long with heroin from mid-January, 2012, until some unspecified point in July, 2012, a period of six months at most.

---

[7] In order to arrive at the amount of heroin involved in this case, we must multiply the amounts of heroin supplied at a time by the number of times the heroin was supplied during the Superseding Indictment period and thus come up with a total. This evidence was supplied entirely by Long, Bland and Agent Laukaitis. Our analysis format demonstrates the deficiencies the court finds with the evidence in this case.

15

- However, Jody Bland testified that Long did not obtain any heroin from defendant in April, 2012, (Tr. at 101), which narrows the relevant time period of the conspiracy to no more than five months.

- Long's own testimony narrows the conspiracy period even further because Long at one point testified that he purchased heroin from defendant for a period of four to five months, but later testified that the arrangement occurred for three to four months. (Tr. at 129, 212).

This evidence shows that the conspiracy period was much shorter than the eight months alleged in Count One of the Superseding Indictment.

Second, the evidence also leaves considerable doubt regarding the <u>frequency</u> of the transactions between Long and defendant during whatever the period of their dealings was:

- At one point, Long testified that defendant traveled to Pittsburgh to supply him with heroin mostly once a week, but at least every two weeks. (Tr. at 129, 168).

- However, other testimony by Long calls into question the regularity of defendant's trips to Pittsburgh because Long also testified that he had to make a special trip to New Jersey in April, 2012, to obtain heroin from defendant because "[i]t seemed like it took longer for [defendant] to get back from our normal." (Tr. at 131). On that trip, moreover, Long came back to Pittsburgh without getting any heroin from defendant. (Tr. at 75, 101, 132-33).

- Long also testified that he traveled to New Jersey on a second occasion, during which he and defendant purchased raw heroin, which he and defendant brought back to Pittsburgh where they processed it into stamp bags. (Tr. at 133-35).

The fact that Long admitted he twice traveled to New Jersey to obtain heroin from defendant because defendant was missing deliveries casts doubt on his testimony that defendant regularly delivered heroin to him in Pittsburgh on a weekly or bi-weekly basis.

Third, the testimony leaves serious doubt as to the <u>amount</u> of heroin involved in each transaction between Long and defendant:

- First, although there was testimony that a brick was one gram and that a certain number of bricks were sold by defendant to Long, there never was any testimony

♦AO 72
(Rev. 8/82)

- that a single brick was actually weighed. When Long testified about purchasing material for the processing and packaging he and defendant were to do in Pittsburgh, there was no mention of a scale. (Tr. at 134-38).

- According to Long, he initially purchased five to ten bricks of heroin from defendant until they found the right application of heroin, although he was not exactly sure when that occurred. (Tr. at 192).

- After the two men got into the swing of things at some unspecified point in time, Long testified that he purchased whatever quantity of heroin defendant brought to Pittsburgh, which was never guaranteed, but was always at least 100 bricks. (Tr. at 128, 167, 201).

- Long also testified that through cash purchases and fronting of heroin by defendant, Long obtained 200 to 250 bricks of heroin from defendant approximately every two weeks. (Tr. at 129, 211).

- Long testified that he and defendant processed and packaged 160 bricks of heroin at a hotel in Pittsburgh, and that defendant fronted Dextrick Lawton 20 bricks of heroin when Long was incarcerated in July 2012. (Tr. at 135, 137, 141-42).

- Agent Laukaitis confirmed she testified before the grand jury that Long told her that he purchased 60 to 100 bricks of heroin from defendant per week in the time period after December, 2011, until August, 2012. (Tr. at 33, Document No. 178).

- When Long was asked if Agent Laukaitis' testimony before the grand jury that he purchased 60 to 100 bricks of heroin per week from defendant was true, he admitted that it was, then attempted to explain it away. (Tr. at 171-72).

Thus, the evidence requires the court to choose from often conflicting testimony how long defendant supplied Long with heroin, how frequently defendant traveled to Pittsburgh to conduct the heroin transactions, and how much heroin defendant supplied Long on each trip to Pittsburgh.

Depending on the time period involved, the frequency of the transactions and the quantity of heroin defendant supplied each time, he may or may not have supplied Long and other members of the conspiracy with one kilogram or more of heroin.[8]

---

[8] For example, if defendant supplied Long 250 bricks (or 250 grams) of heroin every two weeks for three or four months, which is one scenario suggested by Long's testimony, then the amount of heroin

17

Finally, the court notes that the very nature and quality of the evidence in this case creates a reasonable doubt as to its accuracy. Long and Bland, the only witnesses who had direct knowledge of defendant's role in the conspiracy, testified as to criminal events which occurred on an irregular basis on multiple occasions over four years ago. As Bland testified, of course no records of these illegal drug trafficking events were kept, so she and Long were testifying as to their memory of these events.

In light of all the foregoing, the court finds that it has a reasonable doubt that the conspiracy in this case involved one kilogram or more of heroin. It therefore finds defendant not guilty of the charge set forth in Count One of the Superseding Indictment.

---

involved in the conspiracy would be 1,500 to 2,000 bricks (or 1,500 to 2,000 grams) of heroin, which, of course, exceeds one kilogram. However, if defendant supplied Long 120 bricks (or 120 grams) of heroin on a bi-weekly basis for three or four months, which is possible scenario based on Agent Laukaitis' and Long's testimony, then the amount of heroin involved in the conspiracy would be 720 to 960 bricks (or 720 to 960 grams), which is less than one kilogram. Even adding 180 bricks to the low end of that range (consisting of the 160 bricks processed by Long and defendant and the 20 bricks defendant fronted to Lawton), the total amount of heroin involved would be 900 grams, which is less than one kilogram. Therefore, the conspiracy could have involved a number of different quantities of heroin depending on the amount of heroin defendant supplied on each trip to Pittsburgh, how frequently he supplied it and how long that arrangement lasted.

AO 72
(Rev. 8/82)

V.  **Conclusion**

Defendant's renewed oral motion for judgment of acquittal made at the close of all evidence submitted at the non-jury trial will be denied.

Based upon the foregoing findings of fact and conclusions of law, the court finds defendant not guilty as to Count One of the Superseding Indictment at Criminal No. 13-113.

An appropriate order will be entered.

*Gustave Diamond*
Gustave Diamond
United States District Judge

Date: *August 22, 2016*

cc: Brendan T. Conway
Assistant U.S. Attorney

William B. Norman, Esq.
Norman & Tayeh, LLC
795 Sharon Drive
Suite 206
Westlake, OH 44145

AO 72
(Rev. 8/82)